IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

MARY LOU STELTER,

                              Stelter,

        v.                                                OPINION and ORDER

WISCONSIN PHYSICIANS SERVICE                              17-cv-463-jdp
INSURANCE CORPORATION,

                              WPS.

Plaintiff Mary Lou Stelter brings this lawsuit against her former employer, Wisconsin Physicians Service Insurance Corporation (WPS), for discrimination and retaliation in violation of the Americans with Disabilities Act of 1990. She alleges that she was disabled under the ADA due to back pain and that, after a workplace injury aggravated her condition, WPS discriminated against her in various ways, ultimately terminating her based on phony allegations of poor performance. Stelter also contends that the company failed to accommodate her disability and retaliated against her for complaining about discriminatory treatment.

WPS seeks summary judgment on all of Stelter's claims. Dkt. 29. It also moves to exclude the testimony of Dr. Joseph T. Hebl, whom Stelter offers as an expert on the nature and extent of her back injury. Dkt. 72.

Even assuming that Stelter's injury constitutes a disability within the meaning of the ADA, she has failed to adduce evidence sufficient to permit a reasonable jury to infer that the company subjected her to adverse treatment because of her disability, failed to accommodate her limitations, or retaliated against her for engaging in protected activity. Rather, the record demonstrates that WPS disciplined and ultimately terminated Stelter for longstanding deficiencies in her understanding of large group insurance products and her absenteeism. These

performance issues were exacerbated after Stelter's injury, both by changes in WPS's business and the increased frequency with which Stelter left work during the day without providing adequate notice. The court will grant WPS's motion for summary judgment and deny its motion to exclude Hebl's expert testimony as moot.

FACTUAL BACKGROUND

The following facts are undisputed, except where noted.[1]

Stelter began working for WPS in 2002 as a sales support assistant in the company's Eau Claire office. In 2007, she was promoted to agency sales representative. In that role, she was responsible for supporting agency managers in their efforts to sell WPS insurance products to customers around the region. In 2008, Wendy Harings, an agency manager, became Stelter's supervisor. Harings monitored Stelter's performance and conducted her annual performance reviews.

Between 2008 and 2013, Harings was generally positive in her assessments of Stelter's performance. She gave Stelter an overall rating of "exceeds expectations" in 2010 and 2011, and "achieves expectations" in 2009, 2012, and 2013. Harings was consistently complimentary

---

[1] Stelter's approach to the proposed findings of fact have complicated rather than streamlined the court's examination of the record. The court's summary judgment procedures allow the party responding to a motion for summary judgment to file "[i]f necessary, additional proposed findings of fact needed to oppose the motion." Dkt. 10, at 12. But rather than proposing only the necessary additional facts, Stelter completely restated her version of the facts in an 85-page list of 535 proposed facts. Dkt. 66. The proposed facts are repetitive, and many of them cite to evidence that, at best, only partially supports the asserted factual proposition. *See, e.g.*, Dkt. 75 (WPS's responsive document), ¶¶ 211, 218, 253, 267, 329. The court will not wade through such a prolix set of proposed facts. Of Stelter's proposed facts, the court will consider only those that are specifically cited in her brief, Dkt. 65, and supported by admissible evidence.

of Stelter's organizational skills and friendly manner with insurance agents. But she also noted performance deficits that persisted through the years.

Beginning in June 2010, Harings expressed concern about Stelter's tendency to leave work for personal appointments. *See* Dkt. 58-11, at 3 (2009–10 review). In June 2011, Harings counseled Stelter to strive to make appointments over lunch as opposed to at the end of the day, and noted that there was "an opportunity to improve communication in advance" of her appointments. Dkt. 58-12, at 3 (2010–11 review). In June 2012, Harings noted that there was "still concern about always making her appointments so that she leaves at 3:15 or 3:30 instead of doing them over her lunch, or on days off," but that because things had been slow, "this isn't as concerning as it would be if we were busy." Dkt. 58-13, at 2 (2011–12 review). In August of 2013, Harings made the same comment—noting that Stelter's "appointments still seem to be regularly scheduled around 3:15/3:30 timeframe," and that, although it was not a huge issue in light of how slow business was, "it does require others to cover in her absence." Dkt. 34-2, at 3 (2012–13 review).

Harings's reviews of Stelter's performance also noted an ongoing need for Stelter to become more familiar with large group and self-funded insurance products. Large group insurance products and self-funded plans have significantly more complicated underwriting requirements than small group or individual health insurance products, and preparing proposals for such products is more complex. Dkt. 74, ¶¶ 13–14. In the 2011–12 review, Harings identified "[l]earning more about large group and [self-funded] quoting processes (underwriting methodology, etc.)" as Stelter's major work-related development opportunity for the coming year. Dkt. 58-13, at 4. In the 2012–13 review, Harings again identified Stelter's major work-related development opportunity for the coming year as expanding her

understanding of large group processes, since they were likely to "become even more important with [health care reform] as small group slows down even more." Dkt. 34-2, at 6.

Beginning in mid-2013, Harings began to focus more on large-group and self-funded products as a result of changes in the health insurance industry. The parties dispute whether these changes affected the requirements of Stelter's position. WPS contends that, prior to 2013, Harings was able to handle responsibilities related to large group products largely on her own. With the uptick in large group-related responsibilities in 2013, however, Harings increasingly believed that she needed more support from Stelter. Dkt. 74, ¶¶ 36–39. Stelter agrees that Harings's job responsibilities shifted toward large-group and self-funded products. But she disputes that Harings ever expected Stelter to have an understanding of the more complex processes and regulatory requirements applicable to large-group and self-funded products. Stelter contends that her role was to provide administrative support, and that her job duties never changed. *Id.* ¶ 68. In any event, it is undisputed that from mid-2013, Harings's workload came to be dominated by the sale of large group and self-funded products.

The most significant events in this case come after Stelter injured her back while at work on February 18, 2014. An IT worker had been installing computer equipment in a utility room when a shelf broke, and Stelter held up a piece of heavy equipment while he worked to repair it. In the process, she strained her back, possibly aggravating some preexisting spinal issues. Two days later, Stelter filed a confidential injury report, and WPS approved her requests for time off from February 26, 2014, through March 18, 2014.

On March 18, Stelter's doctor cleared her to return to work half days. The doctor's return-to-work report included a hand-written note saying that "[i]f possible [a] sit to stand workstation would be helpful." Dkt. 75, ¶ 143. After just two half days, Stelter's doctor cleared

her to return to a regular work day with modest restrictions (i.e., being allowed to sit, stand, and walk as needed). There was no further mention of a sit-to-stand workstation. But WPS permitted Stelter to sit, stand, and walk as needed throughout the day. On April 17, Stelter's doctor cleared her to return to work with no restrictions, although the doctor did note that Stelter would need ongoing physical therapy.

On June 5, 2014, Harings conducted Stelter's 2013–14 review. In the written portion of the review, Harings observed, among other things, that Stelter continued to schedule her "many appointments" either at the beginning or end of the day instead of during her lunch hour. Dkt. 32-6, at 2–3. She also noted that they had "discussed in previous reviews that it is important for Mary Lou to learn the basis of large group, [self-funded], reporting, etc., to make herself a more well-rounded and valuable employee to the company," but that she had not seen Stelter show "an initiative or commitment to doing that." *Id.* at 4. These concerns had been raised in previous reviews, but for the first time in her career at WPS, Stelter received an overall rating of "improvement required."

During the performance review, Stelter told Harings that she believed Harings's criticism was motivated by frustration about Stelter's time away from work after the back injury. Stelter does not recall what Harings said in response, or if she responded at all. Five days after the performance review meeting, Harings placed Stelter on a six-month performance improvement plan (PIP). *See* Dkt. 34-4. The PIP document stated that Stelter would be expected to communicate openly with Harings about her performance and any training needs she may have. As an initial step, Stelter requested a training on large group coverage. Stelter signed the plan, but added a handwritten proviso above her signature stating "[t]his is due to no training in this area." *Id.*

On June 16, Stelter submitted a written rebuttal to the performance review, which Harings received on June 20. In it, she disputed each of the performance deficits that Harings had identified. She wrote that "[e]ver since [the] workers comp claim there has been a change in attitude" toward her by Harings. Dkt. 32-6, at 7. Stelter also contacted WPS's human resources representative, Lacey Green, and expressed her concern about the reason for Harings's negative review.

Over the next several months, Harings and Stelter's relationship continued to deteriorate. On June 23, Harings told Stelter that she wanted her to start working out of WPS's Wausau office every other week so that she could visit and get to know the various agencies in the area that sold large group coverage. Wausau is a roughly two-hour drive from Eau Claire, and driving such distances caused Stelter pain. The parties dispute whether Harings was aware of this at the time. Stelter contends that, prior to being made to drive to Wausau, she told Harings that "driving in a car for more than a half hour at a time aggravated [her] back terribly." Dkt 58, ¶ 124. Harings testified that Stelter never mentioned that it hurt to drive, and that she assumed that, because Stelter's medical clearance indicated that she had no limitations, Stelter was healthy and capable of making trips to Wausau. It is undisputed that Stelter went on only a total of three to five agent visits before the visits were discontinued in September.

Harings continued to be frustrated by Stelter's frequent and sometimes unannounced absences from work to attend physical therapy and other appointments. On September 16, Stelter told Harings that she had been referred to a neurosurgeon (by way of an email stating that she would be leaving for the appointment in two hours). Dkt. 58-33, at 2. The next day, Harings emailed Stelter to say that she was going to have her hold off on any further travel through the end of the year so that Stelter could support her with large group efforts. Dkt. 58-

6

29. That same day, Harings advised Stelter that she wanted to begin meeting every Monday to go over tasks for the week and check in about training needs. Dkt. 58-49.

A few days later, on September 19, Stelter informed Harings that the neurosurgeon had called her a "prime candidate for back surgery," but that she was planning to try pain injections first and would hold off on any surgery until after their busy season. Dkt. 58-34. The following week, Harings and Stelter commenced their Monday morning meetings. Ultimately, they only met four times—twice in September, once in October, and once in November. Harings took written notes of what she and Stelter discussed at these meetings. In her notes, Harings expressed increasing frustration that Stelter was not asking for additional training and was continuing to leave work for frequent appointments without giving adequate notice. *See* Dkt. 56-5.

Although the PIP was not slated to end until mid-December, Harings determined sometime in October 2014 that she would recommend that Stelter be terminated. She laid out her reasons for doing so in a November 24, 2014 email to Roger Ebert, Vice President of Enterprise Sales and Retention at WPS:

> Mary Lou has had declining reviews over the past few years. . . . [Her] PIP dealt specifically with large group training because Mary Lou had mentioned in her review response comments that the large group training had not been offered, even though she participated in all large group trainings with other Sales Staff.
>
> The issues that remain since her last review are:
>
> Lack of understanding of large group processes and focus, including rating methodologies, self-funding, reporting, etc.;
>
> Failure by Mary Lou to notify staff (me, Paul and Nikki) when she is taking off . . . ;
>
> Failure to give me 24 hour notice . . . for appointments or absences;

> Failure to follow my directions with respect to processes and communication (going against my directions);
>
> . . .
>
> The volume and complexity of the tasks she is handling [are] not consistent with someone in her position. She has not stepped up to grow in the position to where that role should be assisting with gaining/retaining large group or self-funded accounts. She regularly has questions on minor topics that she should already know.
>
> The position of Agency Sales Rep has evolved immensely over the past few years due to Health Care Reform and the changing environments at WPS and in our market and an increased focus on large group and self-funding. I have discussed with Mary Lou at length that she also needs to grow and change to maintain her employment in that position. I do not think she has demonstrated that she is able to do that.

Dkt. 56-10, at 2–3. Ebert approved the termination, based on Harings's recommendation.

When the PIP ended on December 10, 2014, WPS terminated Stelter.

ANALYSIS

**A. Summary judgment standard**

Summary judgment is appropriate if a moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party may not simply rely on the allegations in its pleadings to create such a dispute, but must "demonstrate that the record, taken as a while, could permit a rational finder of fact to rule in [its] favor." *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922,

931 (7th Cir. 1996). Here, Stelter asserts claims under various provisions of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12112, *et seq.*, which the court will address in turn.

## B. Discrimination

The ADA prohibits employers from discriminating against employees on the basis of disability, 42 U.S.C. § 12112(a). In evaluating such claims, as with other types of workplace discrimination claims, courts have historically used the so-called "direct" and "indirect" methods of proof, depending on the nature of the evidence presented. *See Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 852–53 (7th Cir. 2015). Recently, the court of appeals has encouraged district courts to "move away from the many multifactored tests in employment discrimination cases and decide, when considering the evidence as a whole, whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor" caused the challenged action. *Monroe v. Indiana Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017) (applying the approach outlined in *Ortiz v. Werner Enter., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) in the disability discrimination context). To defeat summary judgment under this straightforward inquiry, Stelter must adduce evidence that would, considered as a whole, allow a reasonable jury to find that WPS took adverse action against her because of her disability or retaliated against her for asserting her rights under the ADA.

To prove disability discrimination under § 12112(a), a plaintiff must show that: (1) she is disabled; (2) she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the adverse job action was caused by his disability. *Monroe*, 871 F.3d at 503. WPS challenges Stelter's showing under all three prongs.

As to the first prong, WPS makes a decent case that Stelter was not disabled within the meaning of the ADA. Per the statutory definition, a "disability" is an impairment that "substantially limits one or more major life activities." 42 U.S.C. § 12102(1). It is undisputed that Stelter was able to perform all aspects of her job at WPS without restriction after April 2014. Stelter nonetheless contends that she was disabled because she was substantially limited in her ability to work *other* types of jobs, like as an over-the-road truck driver, and that she sometimes had difficulty sitting. Stelter's argument is dubious, but the court need not engage it further because Stelter's case can be decided on other grounds. For the purpose of this analysis, the court will assume without deciding that Stelter was disabled within the meaning of the ADA after her February 2014 injury.

Stelter's discrimination claim founders on the second and third prongs. As to whether she was a "qualified individual" under the second prong, Stelter has not supplied evidence sufficient to allow a jury to conclude that she met WPS's legitimate expectations and satisfied the essential functions of her position. *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 863 (7th Cir. 2005). Whether Stelter was a qualified individual is inextricably linked to the question of whether WPS's reasons for terminating her were pretextual, and the court will address the question in more detail in that context.

Stelter's case on the third prong has two problems. First, there is no question that her termination was an adverse employment action. But she cannot show that her performance review, or being made to drive to Wausau, are adverse actions. And, fatal to all her claims, she cannot show that her disability was the "but for" cause of any adverse employment actions, as is required under the third prong. *A.H. by Holzmueller v. Illinois High Sch. Ass'n*, 881 F.3d 587, 593 (7th Cir. 2018).

Stelter opposes summary judgment arguing that discriminatory intent is shown by a combination of antagonistic comments by Harings, suspicious timing, and evidence of pretext. The court addresses each of these categories of evidence in turn.

## 1. Harings's allegedly antagonistic comments

The parties agree that Harings is the pertinent decisionmaker, even though the termination decision was ultimately approved by Ebert. So the court will follow Stelter and focus its analysis on Harings's actions.

Stelter contends that she has direct evidence of Harrings's discriminatory animus, mostly in the form of antagonistic comments by Stelter. Dkt. 65, at 26–30. Stelter cites five incidents. First, she points to a March 24, 2014 email in which Harings criticized (or "chastised," to use Stelter's term) Stelter for failing to schedule an over-long medical appointment over her lunch hour.[2] Second, she points out that Harings once printed our hard copies of Stelter's appointment-related emails and circled the dates and times of Stelter's various absences. Dkt. 58-14. Third, she notes Harings's reference in the June 2014 performance review to Stelter's "many appointments" and "personal calls" during the workday, which Stelter says were related to ongoing treatment for her disability. Dkt. 32-6, at 3. Fourth, Stelter highlights a comment that Harings made in her notes memorializing one of their PIP meetings, stating that Stelter "routinely has doctor visits" and that Harings would "make sure to document any [appointments] in the future that do not have adequate notice." Dkt. 56-5,

---

[2] The actual email in question reads as follows: "Mary Lou – when I said you could use your lunch for your appointments today, I did not realize they were such that you would be gone from [the] office for so much time. We will let it go today but for future visits, please schedule them over your lunch or take PTO." Dkt. 58-17, at 1.

at 4. Finally, Stelter points to language from Harings's November 24 email to Ebert listing failure to give notice of absences among the reasons for recommending Stelter's termination.

These instances are not evidence of discriminatory animus for two reasons. First, Harings's criticism of Stelter's absences long predates her February 2014 injury. Stelter's tendency to schedule her appointments during the work day—and Harings's stated preference that she strive to schedule them more strategically—cropped up in every one of Stelter's reviews beginning in 2009–10. And Stelter's habitual failure to communicate with Harings about her absences in advance was documented as early as her 2010–11 review. *See* Dkt. 58-12, at 3 (noting that Stelter had "an opportunity to improve communication in advance of comp time that is used to make up for appointments"). The fact that Harings raised these concerns before Stelter's back injury undercuts any inference that Harings raise these issues in response to the injury. Stelter argues that there was never any official company policy in place requiring that employees try to schedule appointments over their lunch breaks or provide 24-hours' advance notice where possible, but that is beside the point. The ADA does not prohibit employers from imposing reasonable expectations on an employee in the absence of a written policy, and Stelter has adduced no evidence that other similarly-situated employees who reported to Harings were subject to different requirements.

Second, there was nothing harassing, intimidating, or discriminatory about the way in which Haring raised these issues. Stelter describes these incidents as "chastising." But Harings simply, and professionally, admonished Stelter to make an effort to minimize the impact of her absences on her colleagues. "The ADA does not protect persons who have erratic, unexplained absences, even when those absences are a result of a disability. The fact is that in most cases, attendance . . . is a basic requirement of most jobs." *Waggoner v. Olin Corp.*, 169

F.3d 481, 484 (7th Cir. 1999). Stelter adduces no evidence that Harings ever commented on any inconvenience posed by Stelter's *disability*. Rather, the evidence shows that Harings asked Stelter to strategically schedule appointments, list appointments in her calendar, and provide advance notice of appointments so that coverage of her duties could be arranged. These are reasonable requests that in no way suggest discriminatory animus. Likewise, the fact that Harings subsequently disciplined Stelter for her failure to follow these instructions does not suggest any discriminatory animus. *See Washington v. Take Care Servs., LLC*, No. 13 c 7436, 2015 WL 1280833, at *8 (N.D. Ill. Mar. 18, 2015) ("Legitimate discipline is not harassment.").

### 2. Suspicious timing

Stelter contends that the timing of various adverse events correlates suspiciously with her disclosures to Harings regarding her ongoing treatment and medical needs. Temporal proximity alone is rarely enough to preclude summary judgment. *Stone v. City of Indianapolis Pub. Utils Div.*, 281 F.3d 640, 644 (7th Cir. 2002). But when viewed in light of other evidence, such as evidence of pretext, timing can raise triable issues. *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012).

Stelter points to four instances in which she believes the timing is sufficiently suspicious as to raise a genuine issue of material fact. Although certain of these instances were close in time to disclosures Stelter made about her medical treatment, none of them support a reasonable inference of discrimination when viewed in light of the evidence as a whole.

### a. Poor performance review and PIP

Stelter contends that the timing of her poor performance review in June of 2014 is suspect because Stelter had not been subject to discipline or given any warnings about her

performance prior to her workplace injury. But Stelter had, in fact, received performance feedback about these same issues for years. Also, WPS did not impose any performance-related discipline on Stelter until four months after her workplace injury and two months after she had been cleared by her doctor to work without any restrictions. Without strong evidence that the performance issues were manufactured and pretextual, this timing does not give rise to an inference that Stelter's disability was the but for cause of the poor performance review or PIP.[3]

### b. Directive that Stelter make trips to Wausau

Stelter raises the matter of being required to drive to Wausau in several contexts, most significantly as evidence of retaliation, Dkt. 65, at 65–67, and as an example of a failure to accommodate, *id.*, at 72.

But Stelter also cites the directive that Stelter drive to Wausau to visit agents as evidence of suspicious timing. *Id.* at 33-34. Stelter contends that just before Harings directed her to visit agents in Wausau, Stelter told Harings that driving or riding in a car for long periods made her back hurt. Dkt. 75, ¶ 265. Whether Stelter told Harings this is disputed, but for purposes of summary judgment, the court must credit Stelter's version, which is supported by her deposition testimony. Dkt. 35 (Stelter Dep. 223:22–224:12). Stelter also says that the directive to travel to Wausau came three days after Harings received Stelter's written rebuttal to her performance review. Dkt. 75, ¶ 266.

Viewed in context, the timing here is not suspicious. Stelter had received a poor performance review in June of 2014, so it is not surprising that Harings took steps that month

---

[3] Stelter also flags as suspicious the fact that Harings's March 24 email admonishing her for the length of her appointment followed less than a week after Stelter's return to work post-injury. But as already discussed, nothing about that email suggests discriminatory animus. And such admonishments were ubiquitous while Harings was supervising Stelter.

to monitor and improve Stelter's performance. Requiring Stelter to work with and get to know other agents, even if they were in Wausau, would be a legitimate assignment. Stelter concedes that such driving was part of her defined job duties. And she admits that was able to make the drive, although it caused her pain. Dkt. 65, at 17. Stelter did not submit any doctor's excuse that she should not drive for extended periods; the last word from Stelter's physician was that she had no restrictions.

### c. Starting the weekly meetings

Stelter says that one day after she told Harings that she had been referred to a neurosurgeon for her back (on September 16), Harings discontinued the trips to Wausau and informed her that they would be meeting every Monday thereafter in accordance with the PIP. Stelter says that the timing is suspicious because the weekly meetings had been called for in the PIP in June, but Harings did not schedule any until Stelter announced that she was a candidate for surgery. Stelter offers no reason why this timing would demonstrate any discriminatory animus, and the court can think of none.

### d. Decision to recommend termination

Finally, Stelter points to the fact that Harings decided to terminate Stelter after receiving word that she was a candidate for back surgery. Stelter sent an email about potential back surgery on September 19, 2014. Harings decided to recommend Stelter's termination sometime in October. Again, viewed in context, the timing is not suspicious. The record shows that Harings decided to recommend termination because she sincerely believed that Stelter's job performance was deficient, based substantially on shortcomings that Harings had identified long before Stelter injured her back.

### 3. Evidence of pretext

Stelter's main argument, based on the space devoted to it, is that that Harings's asserted reasons for recommending her termination are pretextual. Dkt. 65, at 36–54. "Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action." *Argyropoulos v. City of Alton*, 539 F.3d 724, 836 (7th Cir. 2008). It is not enough for Stelter to adduce evidence that Haring might have been wrong about her performance, or that Haring was unfair or too hard on her. *Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012). To raise a genuine dispute of material fact as to pretext, Stelter must "identify such weaknesses, implausibilities, inconsistencies, or contradictions" in Harings's reasons "that a reasonable person could find [them] unworthy of credence." *Id.* (quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 791 (7th Cir.2007)).

Stelter argues that Harings's complaints about Stelter's job performance were so devoid of factual basis that a reasonable jury could conclude that Harings made them up. "Where an employer's reason for a termination is without factual basis or is completely unreasonable, that is evidence that an employer might be lying about its true motivation." *Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 646 (7th Cir. 2013). Stelter faces a nearly insurmountable hurdle here, because the primary reasons for her termination were ones that Harings had cited well before she injured her back. After reviewing Stelter's purported evidence of pretext, the court concludes that Stelter has failed to adduce evidence sufficient to support a reasonable finding that Harings's reasons for terminating Stelter were insincere.

#### a. Stelter's understanding of large group and self-funded products

Stelter contends that Harings's asserted concerns about Stelter's grasp of large group and self-funded products was a pretext for disability discrimination. As evidence, she points to

complimentary comments Harings made about Stelter's handling of large group-related tasks in her 2012–13 performance review. *See, e.g.*, Dkt. 34-2, at 3 ("Mary Lou demonstrates good follow up on both large and small group"); *id.* at 5 ("Mary Lou has become more comfortable sending large group follow up to agents when needed so I am pleased with that."). But, consistent with her reviews from years prior, the 2012–13 review identifies increasing Stelter's comfort level with large group processes as her major work-related development opportunity for the coming year. Indeed, Harings's comments forecast that large group prospects would "become even more important with [health care reform] as small group slows down," and emphasized the "need to be more flexible with our job roles to adapt to the changing market and client needs." *Id.* at 6. Read in context, Harings's comments on Stelter's 2012–13 review do not cast doubt on the sincerity of her subsequent performance concerns. To the contrary, they clearly foreshadow those concerns.[4]

Stelter contends that Harings did not provide any specific examples of errors that Stelter made in handling large group proposals during her deposition. But actually, Harings spoke in specific terms about the basis of her complaints about Stelter's poor understanding of large group. *See, e.g.*, Dkt. 36 (Stelter Dep. 250:7–252:19) (Harings testified that she discontinued Stelter's travel to Wausau after Stelter continued to schedule meetings with individual and

---

[4] It is undisputed that large group came to dominate Harings workload over the subsequent year. For that reason, Stelter's citation to *Kohls v. Beverly Enters. Wis., Inc.*, 259 F.3d 799 (7th Cir. 2011) is inapposite. In *Kohls*, the court of appeals observed that a genuine dispute of material fact could arise "if, for example, a supervisor who had been aware of problems with an employee did not decide to fire the employee until she took [FMLA] leave, and the supervisor based the firing on the incidents of which the employer had already been aware." 259 F.3d at 806. Here, Harings raised Stelter's understanding of large group over the course of several years, but these deficits did not become acute until large group became the singular focus of Harings's job.

small group agents, which Harings took as an indication that Stelter had no grasp of which agents sold large group); *id.* at 58:25–59:5 (Harings testified that Stelter was unable to answer the questions of large group agents without referring to a cheat sheet Harings created). Stelter contends that Harings provided no such examples in her conversations with Ebert and Green. Ebert and Green dispute this, but even assuming that Stelter is correct, Harings's failure to enumerate all Stelter's errors to company management is not evidence that Haring was fabricating her concerns.

Stelter also points to various email communications that she says demonstrate that Harings in fact had confidence in Stelter's understanding of large group and self-funded processes. *See* Dkt. 58-37 (emails in which Harings asks Stelter to complete various large group-related tasks); Dkt. 58-38 (email from Harings to agents inviting them to "call me or Mary Lou" with any questions about large group products); Dkt. 58-29 (in email explaining her decision to discontinue Stelter's trips to Wausau, Harings states "I am swamped with renewal prospects right now and I need you in the office to assist me"). Stelter says that these facts constitute affirmative evidence that Harings was lying about her dissatisfaction with Stelter's understanding of large group and self-funded products. But it would be a stretch to say that any of these emails demonstrate Harings's full confidence in Stelter's abilities. Indeed, some of them contain hints of Harings's frustration with Stelter. *See* Dkt. 58-37, at 3–5 (email exchange in which Stelter says she cannot complete a large group quote request form until she receives plan summaries, and Harings clarifies that Stelter can, in fact, complete the form based on the information already available).

Stelter's contention that Harings manufactured pretextual concerns about Stelter's understanding of large group and self-funded products is further undermined by the way Stelter

responded to Harings's concerns at the time of the June 2014 performance review. Although Stelter now says that she knew how to perform the large group duties of her job and that the trainings Harings sent her to covered topics she was well-versed in, she responded to Harings's negative feedback in 2014 by requesting training on large group coverage and noting that any deficiencies in her comprehension were "due to no training in this area." Dkt. 34-4. This suggests that, at least at the time, Stelter did not dispute the accuracy or sincerity of Harings's criticisms, but rather blamed any such deficiencies on inadequate training.

### b. Feedback from third parties

Stelter contends that Harings's asserted beliefs about Stelter's lack of understanding of large group and self-funded products cannot have been sincere because Harings lied about receiving negative feedback on Stelter's performance from four individuals: Bob Varebrook, Francis Friend, Rick Griggs, and Sarah Niesl. Specifically, during her deposition, Harings testified that she made her recommendation to terminate Stelter "in conjunction with [Ebert] and HR and after talking to other people in the company." Dkt. 36 (Harings Dep. 170:9–11). Harings said that Varebrook, Friend, Griggs, and Niesl had each expressed a lack of confidence in Stelter's abilities at some point, although she was unable to recall much in the way of specific details or timeframes. *Id.* at 171:9–177:3. But those four individuals each testified either that they had not given Harings negative feedback on Stelter's performance, or that they did not remember doing so.

If Harings did indeed misrepresent or lie about third-party feedback, this would lend support to the notion that she manufactured phony allegations of Stelter's deficient performance as a pretext for discrimination. But Stelter has no evidence that Harings lied at the time the termination decision was made. Harings put the full basis for her recommendation

to terminate Stelter in her email to Ebert. Dkt. 56-10, at 2–3. Nor does Stelter have any evidence that Harings or WPS gave shifting explanations for her termination. All Stelter has is some potentially inaccurate deposition testimony about the individuals with whom Harings consulted at the time. In her deposition in this case, Harings mentioned discussions with Varebrook, Friend, Griggs, and Niesl when she was asked to remember—about four years after the fact—the complete basis of her negative impressions of Stelter's performance. Harings's testimony on this point was not corroborated by Varebrook, Friend, Griggs, and Niesl. But no reasonable jury could conclude from this lack of corroboration that Harings's asserted reasons for the termination were made up, particularly when Haring set them out in writing at the time.

### c. Performance deficiencies related to absences and advance notice

Stelter contends that Harings's complaints about her failure to give adequate notice of absences are also pretextual. The record demonstrates that Stelter frequently failed to provide notice of her absences, and when she did provide such notice, it was often only an hour or two in advance. *See, e.g.*, Dkt. 58-14, at 2, 8, 9, 13, 14, 16, 19, 20, 21, 22, 23, 24, 25 and Dkt. 58-33, at 1–2. Stelter says that she gave notice of her appointments "when she could," Dkt. 65, at 45, but there is no evidence that Stelter ever explained to Harings why giving notice was so often infeasible.

Stelter also says that Harings only manufactured a policy of requiring 24 hours' notice after speaking with HR in October 2014, and contends that she deployed that fake policy as a pretext to justify Stelter's termination. In fact, the record shows that Harings had an expectation that Stelter communicate about her absences in advance as early as 2011. *See* Dkt. 58-12, at 3 (2010–11 review). And as discussed previously, the ADA does not prohibit

employers from imposing reasonable expectations on an employee in the absence of a written policy.[5] Harings's frustration with Stelter's lack of communication was likely exacerbated by the increased frequency with which she left for appointments following her injury in February 2014. But Stelter has adduced no evidence that Harings's expectations around absences were motivated by anything other than a legitimate desire to minimize the effect Stelter's absences would have on office operations. The evidence does not support an inference that Harings's concern with Stelter's absences was a pretext for discrimination.

### d. Allegations that Stelter failed to follow Harings's directives

Stelter says that Harings listed "failure to follow my directions with respect to processes and communication" as among the reasons for recommending Stelter's termination, but that Harings did not provide any specific examples in her emails to Ebert recommending termination. Nor did Harings cite any such examples in her deposition. Stelter says that this is evidence of pretext. But again, Harings's failure to enumerate specific instances to company management is not evidence that she was fabricating her concerns. The record demonstrates that Harings had a basis for believing that Stelter disregarded her directives. *See, e.g.*, Dkt. 58-21, at 2–3 (in email exchange about a large group sales pitch to a school district, Harings expressed disappointment that Stelter had failed to respond to a time-sensitive email for hours until Harings finally called Stelter to follow up about it); Dkt. 58-33, at 1 (email in which

---

[5] Stelter also argues that certain of Harings's performance expectations (e.g., that Stelter provide advance notice of absences or respond to emails in a timely fashion) were not included in the list of performance metrics on Stelter's performance review templates. *See, e.g.*, Dkt. 75, ¶¶ 94, 341, 399, 485, 500 ("communicating regarding absences" was not one of Stelter's performance standards); *id.* ¶ 227 ("email timeliness" was not one of Stelter's performance standards). But these expectations were incorporated into Stelter's performance reviews under the "Dependability" and "Job Functions" metrics.

Harings reiterates prior request that Stelter list her appointments on her calendar ahead of time); Dkt. 58-43, at 6 (email in which Harings admonishes Stelter for continuing to advise an agent about Medicare despite Harings's express directive that she not do so).

Stelter contends that Harings's directives were frequently wrong or inconsistent, and that it was Harings, not Stelter, who failed to stick to protocol. For example, Stelter notes an instance in which Harings instructed Stelter to email an agent to let her know that WPS was anticipating a 39% load. Stelter did so. The next day, Stelter emailed a different agent and advised him that WPS was anticipating a 92% load, consistent with Harings's instruction as to the different agent from the day before. Harings emailed Stelter to say that she wished Stelter had spoken to her before sending it, as putting the percent of increase in emails "doesn't make us look good at all." Dkt. 58-40. At most, this shows that Harings's instructions could be inconsistent or confusing. But it provides no support for the theory that Harings fabricated her concerns about Stelter's failure to follow directives.

### e. Other alleged performance issues

Stelter disputes several other aspects of WPS's characterization of her performance, but none of her evidence raises a genuine issue of material fact as to whether Harings was sincerely dissatisfied with Stelter. Many of these are such minor details that even if Stelter were correct, they would be insufficient to show pretext in light of Harings's well-documented primary concerns.

In her email to Ebert recommending that Stelter be terminated, Harings stated that Stelter was "very delinquent" in logging prospective sales in Sales Logix, WPS's database for tracking sales leads. Dkt. 56-10, at 3. Stelter says that this allegation is fabricated and pretextual because in prior years Harings had praised Stelter's handling of Sales Logix. Stelter

also asserts that any leads that were not entered timely were only delayed because Harings had not yet given Stelter permission to close them out. Assuming that this was indeed the case, Stelter has nonetheless failed to raise a genuine dispute of material fact as to pretext because failure to maintain Sales Logix was not among the chief reasons Harings provided for recommending that Stelter be terminated. Even if Harings was wrong about the Sales Logix situation, Stelter has adduced not evidence that would support the conclusion that Harings made it up.

Stelter contests the factual accuracy of several other representations Harings made in her email to Ebert, but these are also minor details. And again, even if Harings were mistaken on some of the details, it would not suggest that Harings was making things up. Stelter disputes as unfair Harings's assertion in the email that she was performing "all large group tasks" herself, *id.*, but none of the evidence Stelter cites in disputing this assertion actually shows that Stelter was doing large group-related work as of November 2014. *See* Dkt. 65, at 49 (citing inapposite portions of Stelter's declaration and proposed findings of fact). Stelter also disputes Harings's assertion that Stelter had "declining reviews over the past few years." Dkt. 56-10, at 2. But the record shows that Stelter had gone from receiving a rating of "exceeds expectations" in 2010 and 2011, to "achieves expectations" in 2012 and 2013, to "needs improvement" in 2014, so Harings's statement was not inaccurate. Finally, Stelter notes that Harings's assertion that she and Stelter "had been meeting weekly for months" to discuss Stelter's performance issues was inaccurate. *Id.* at 3. Although Stelter is correct that Harings overstated the frequency with which she and Stelter met, such a minor inaccuracy does not give rise to an inference of pretext.

Stelter's remaining arguments simply dispute the accuracy of Harings's criticisms of Stelter's performance without adducing any additional evidence that those criticisms were

insincere.[6] Ultimately, nothing in the record gives rise to an inference that WPS lacked a good faith basis to believe that Stelter suffered from serious, ongoing performance issues. Regardless of whether Harings's expectations were fair or her criticisms warranted, Stelter has not adduced evidence that Haring's concerns were fabricated, and nothing suggests that any of WPS's actions were motivated by Stelter's disability.

## C. Hostile work environment

Stelter asserts a second discrimination claim under § 12112(a) of the ADA, on the theory that Harings created a hostile work environment. The court of appeals has not yet determined whether hostile work environment claims are cognizable under the ADA. *Mashni v. Bd. of Educ. of City of Chicago*, No 15 c 10951, 2017 WL 3838039, at *9 (N.D. Ill. Sept. 1, 2017). Courts in this circuit have entertained them anyway, *see id.* (collecting cases), so the court will do the same.

To establish a claim under a hostile work environment theory, a plaintiff must furnish proof that: (1) the plaintiff's workplace was both subjectively and objectively hostile; (2) the plaintiff was harassed because of her disability; and (3) the harassment was so severe and pervasive as to alter the conditions of employment or create an abusive working environment. *Id.* at *10 (quoting *Mannie v. Potter*, 394 F.3d 977, 982 (7th Cir. 2005)). Here, Stelter posits

---

[6] For example, Stelter spends more than a page discussing an incident involving a failed sales pitch that WPS made to a school district in April 2014, even though Harings did not cite it as reason underlying Stelter's termination and WPS does not mention it in its brief. It is undisputed that, on the day in question, Stelter neglected to send certain information to an agent for several hours despite Harings's request that she do so right away. During her deposition, Harings said that she believed Stelter's untimeliness caused WPS to lose out on the sale. Stelter vigorously disputes that WPS's failure to close the sale was in any way attributable to her delay. But this is beside the point. What matters is whether Harings had a good-faith basis for believing that Stelter's performance was deficient, which she clearly did in this instance.

that she suffered a hostile work environment based on the following events: (1) the poor performance review; (2) chastisement and harassment about her medical appointments; (3) the directive that she travel to Wausau; (4) the imposition of the weekly meeting requirement during the latter part of Stelter's PIP, during which Harings allegedly yelled, screamed, and swore at Stelter; and (5) Harings's decision to take away Stelter's more interesting job duties and replace them with menial tasks that impeded Stelter's job performance. The court has already concluded that these events were not causally connected to Stelter's disability. Even were this not the case, Stelter has not shown that they meet the other two elements of a hostile work environment claim.

As for the poor performance review and the alteration of Stelter's job duties, neither of these are a sufficient basis for a hostile work environment claim as a matter of law. The court of appeals has rejected the notion that unfavorable performance reviews or performance improvement plans can constitute evidence of harassment so severe or pervasive as to constitute a hostile work environment. *See, e.g.*, *Darbha v. Capgemini America Inc.*, 492 Fed. App'x 644, 647 (7th Cir. 2012). Likewise, a mere alteration in the nature or scope of an employee's job responsibilities will not support a hostile work environment claim, especially where the record fails to link those actions to discriminatory animus. *See Boss v. Castro*, 816 F.3d 910, 920–21 (7th Cir. 2016).

As for Harings's directive that Stelter travel to Wausau in spite or because of the pain Stelter experienced while driving, it is undisputed that occasional travel was listed among Stelter's job responsibilities and that she made only three to five trips total. This is not sufficiently severe or pervasive to sustain a claim for hostile work environment. *See, e.g.*, *Smith v. Illinois Dep't of Transp.*, No. 15 c 2061, 2018 WL 3753439, at *12 (N.D. Ill. Aug. 8, 2018)

("requiring an employee to perform [her] basic job duties does not create a hostile environment").

Stelter's allegations that Harings chastised her for her medical appointments and yelled, screamed, and swore at her during their weekly meetings also fail to support a hostile work environment claim. The only instance of Harings's "chastisement" that Stelter points to is the March 24, 2014 email admonition discussed *supra* at note 2. But Harings's email takes a professional tone, and expresses a legitimate, non-discriminatory request that Stelter communicate more clearly about her absences and try to schedule them over her lunch breaks. Regarding Stelter's allegation that Harings screamed and swore at her, Stelter failed to explain what Harings said or how often this occurred. Without this information, no one could find that this conduct was either severe and pervasive. Dkt. 35 (Stelter Dep. 230:8–231:8). *See Smith*, 2015 WL 3753439, at *12 ("Yelling and swearing at an employee is obviously unprofessional, but [plaintiff] does not describe that it rose to a level that could be deemed a hostile work environment.").

## D. Retaliation

The ADA prohibits employers from retaliating against employees who assert their rights under the act. 42 U.S.C. § 12203(a). To establish a case of retaliation under the ADA, a plaintiff must show that: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse action; and (3) there is a causal connection between the two. *Dickerson v. Bd. of Trustees of Comm. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011). Here, Stelter contends that she engaged in statutorily protected activity on three occasions: (1) when she voiced her concern during the June 5, 2014 performance review that Harings was upset with her because of the back injury and informed Harings that she would be submitting a written rebuttal to the

review; (2) when she spoke with human resources about Harings's treatment of her and noted her belief that it was related to her injury; and (3) when she submitted her written rebuttal alleging that Harings's change in attitude toward her stemmed from her "worker comp claim." She contends that WPS retaliated against her by directing her to start traveling to Wausau three days after submitting her rebuttal, and by terminating her later that year.

Stelter's retaliation claim falters on the first element. Stelter has failed to show that she engaged in activity protected by the ADA. Stelter does not allege that she ever raised concerns that she was being retaliated against because of a *disability*; it is undisputed that she referred only to her "back injury" or "worker's comp claim" in her various communications with Harings and HR. Dkt. 75, ¶¶ 232, 249, 252, 257. An injury is not a disability, and an employer's retaliation against an employee for availing herself of worker's compensation is not ADA-protected activity. *See Briscoe v. Vill. of Vernon Hills*, No. 15 c 10761, 2017 WL 11163863, at *2 (N.D. Ill. Mar. 29, 2017) ("[P]laintiff's assertion that he was retaliated against for filing 'line-of-duty disability' . . . claims does not affect his ADA retaliation claim because they are not protected activity under the ADA.").

Stelter's claim also falters on the second element, insofar as it relies on the trips to Wausau as an adverse action. To give rise to an inference of discrimination, the employment action under review must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Porter v. City of Chicago*, 700 F.3d 944, 954 (7th Cir. 2012). Here, it is undisputed that Stelter had been cleared to work without restrictions, and that occasional travel was listed among her job responsibilities. Dkt. 32-3, at 3. Asking an employee to perform her job duties will not typically constitute an adverse employment action. *Carl v. Pramely*, 188 F. Supp. 2d 991, 1004 (S.D. Ill. 2001). It is also undisputed that Stelter only had to make

three to five trips to Wausau, which further undercuts any inference that Harings's directive constituted a materially adverse action. Employment decisions that cause an employee unhappiness and inconvenience are not actionable adverse employment actions. *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 532 (7th Cir. 2003), *overruled on other grounds by Ortiz*, 834 F.3d 760. Thus, Harings's directive that Stelter occasionally travel to Wausau does not give rise to a viable discrimination claim.

Stelter's retaliation claim also falters on the third element. Once again, Stelter fails to adduce evidence from which a reasonable jury could infer that there was a causal connection between her protected activity and the adverse action she suffered. Indeed, the *only* evidence Stelter highlights is the timing of the events in question: The directive that Stelter begin driving to Wausau came on the heels of her performance review rebuttal, and Harings's decision to terminate Stelter followed approximately four months later. But, for reasons discussed above, WPS has adduced ample reasons for the decision to require Stelter to make occasional trips Wausau, and ultimately to terminate her. Without any additional evidence that these actions were causally related to Stelter's complaints, there is no reasonable basis on which to infer retaliation. Like most cases involving allegations of suspicious timing, temporal proximity alone is simply not sufficient to raise a genuine dispute of material fact. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2006). The court will grant summary judgment on Stelter's retaliation claim.

## E. Failure to accommodate

The ADA prohibits an employer from discriminating against an employee on the basis of disability with respect to terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a). This includes "not making reasonable accommodations to the known physical or

mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business." *Id.* § 12112(b)(5)(A). To establish a claim for failure to accommodate, a plaintiff must show that: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability. *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 682 (7th Cir. 2014).

As discussed above, it is not clear that Stelter was disabled, or that she was otherwise qualified. But for the purposes of evaluating Stelter's failure to accommodate claim on summary judgment, the could will assume that she can make the requisite showing on elements one and two. The court will focus on the question of whether WPS failed to reasonably accommodate Stelter's back injury.

Stelter contends that WPS failed to accommodate her back injury by: (1) infringing on her ability to schedule doctor's appointments when she needed to without interference; (2) requiring her to drive long distances; (3) failing to provide her with a sit-to-stand desk; and (4) preemptively terminating her employment before she could request time off for surgery. These claims are in tension with Stelter's concession that she did not actually need or request any accommodation from WPS after she was cleared to work without restrictions in April 2014. Dkt. 74, ¶ 70. This alone would doom her failure to accommodate claims. *See Brumfield v. City of Chicago*, 735 F.3d 619, 632 (7th Cir. 2013) ("[A]n employer's accommodation duty is triggered only in situations where an individual who is qualified on paper requires an accommodation in order to be able to perform the essential functions of the job."). But even if the court assumes away this problem, Stelter's failure to accommodate claims would still fail.

Regarding WPS's alleged infringement on Stelter's ability to schedule doctor's appointments without interference, it is undisputed that WPS never actually interfered with or prevented Stelter from attending any appointment. Rather, Harings simply requested that, where possible, Stelter make an effort to minimize the effect her absences would have on office operations. Although she does not say so outright, Stelter's position appears to be that she was entitled, by virtue of her disability, to leave WPS at any time, with or without providing notice in advance. But the ADA does not entitle a disabled employee to the accommodation of her choice. *Swanson v. Vill. of Flossmoor*, 794 F.3d 820, 827 (7th Cir. 2015). Requiring employees to give advance notice of absences is a reasonable and commonplace workplace requirement. "Violation of a workplace rule, even if it is caused by a disability, is no defense to discipline up to and including termination." *Budde v. Kane Cty. Forest Preserve*, 598 F.3d 860, 863 (7th Cir. 2010).

Stelter also alleges that WPS failed to accommodate her disability when Harings directed Stelter to drive to Wausau despite knowing that driving long distances caused Stelter back pain. As a general rule, "[a]fter an employee has disclosed that she has a disability, the ADA requires an employer to engage with the employee in an interactive process to determine the appropriate accommodation under the circumstances." *Spurling v. C&M Fine Pack., Inc.*, 739 F.3d 1055, 1061 (7th Cir. 2014). The court will assume for the purposes of this motion that Haring and WPS knew that extended driving caused Stelter back pain. But Stelter concedes that she could make the drive, and Stelter never actually requested any accommodation. "[A] plaintiff typically must request an accommodation for [her] disability to claim that [s]he was improperly denied an accommodation under the ADA." *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 813 (7th Cir. 2015). This case does not feature

the type of "special circumstances" that courts have deemed sufficient to obviate the employee's responsibility to request accommodation, as with an employee who has a severe cognitive disability that impairs the ability to make the request. *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1179 (7th Cir. 2013), *overruled on other grounds by Ortiz*, 834 F.3d 760.

As for the sit-to-stand desk, Stelter contends that WPS's accommodation obligation was triggered by virtue of the single, handwritten doctor's note stating, "[i]f possible [a] sit to stand workstation would be helpful." Dkt. 75, ¶ 143. A follow-up doctor's note provided two days later made no further mention of a sit-to-stand workstation. Stelter never asked WPS for this accommodation and she does not explain why it was insufficient for her to simply get up and move around the office as she wished, which WPS allowed her to do. Regardless, the doctor's note state only that the workstation would "be helpful," not that it was necessary. Stelter cites no authority for the proposition that a doctor's passing, equivocal suggestion is sufficient to trigger an employer's accommodation obligations under the ADA.

As to the final failure to accommodate claim, Stelter alleges that, by terminating her approximately a month and a half after finding out that she was a prime candidate for surgery, WPS preemptively failed to accommodate her need for surgery. But other than timing and speculation about Harings's motives, Stelter adduces no evidence that Stelter's prospective surgery in any way factored into WPS's termination decision. The court will grant summary judgment to WPS on Stelter's failure to accommodate claims.

ORDER

IT IS ORDERED that:

1. WPS Wisconsin Physician Service Insurance Corporation's motion for summary judgment, Dkt. 29, is GRANTED.

2. WPS's motion to exclude Joseph T. Hebl is DENIED as moot.

Entered November 30, 2018.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge